IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| EC & SM GUERRA, LLC D/B/A GUARDIAN ANGEL CHILD DEVELOPMENT CENTER, | § § § § | |
| *Plaintiff,* | § § | CIVIL ACTION NO. 5:20-cv-660 |
| v. | § § | |
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | § § § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### A. PARTIES

1. Plaintiff, EC & SM Guerra, LLC d/b/a Guardian Angel Child Development Center ("Guardian" Angel"), is a limited liability company doing business in Bexar County, Texas.

2. Defendant, Philadelphia Indemnity Insurance Company is a domestic insurance carrier, incorporated in the State of Pennsylvania and engaging in the business of insurance in the State of Texas, and may be served with process by serving its agent for service of process, C T Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## B. JURISDICTION

3.     The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because plaintiff and defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

## C. VENUE

4.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

## D. CONDITIONS PRECEDENT

5.     All conditions precedent have been performed or have occurred.

## E. FACTS

6.     Plaintiff is the owner of a commercial property insurance policy, policy number PHPK1197389, issued by the defendant (hereinafter referred to as the "policy").

7.     Plaintiff owned the insured property that is specifically located at 209 Honeysuckle Lane, San Antonio, Texas 78213 (hereinafter referred to as the "property").

8.     Defendant or its agent sold the insurance policy to plaintiff.

9.     On or about March 18, 2018, plaintiff's property sustained windstorm damage. Plaintiff submitted a claim to Philadelphia Indemnity against the policy for damage caused to the property as a result of the wind. Plaintiff asked Philadelphia Indemnity to cover the cost of repairs to the property pursuant to the policy and any other available

coverages under the policy.  Philadelphia Indemnity assigned claim number 1160591 to plaintiff's claim.

10.    On or about March 27, 2018, Jason Hodge ("Hodge"), on behalf of Philadelphia Indemnity, inspected the property in question. The storm caused significant damage to the roof, including loss of granules to the shingles.  Wind damage uplifted and removed shingles, which would not allow the shingles to reseal to prevent water intrusion.  The wind lifted and loosened the nails that previously fastened the shingles to the sheathing. Water penetrated the newly created openings and damaged the plywood sheathing.

11.    Hodge's unreasonable investigation of the claim included a failure to comply with construction industry standards concerning roof inspections and when to replace or repair a roof. The roof required full replacement, including repairs to the roof jack, drip edge, and other structural parts of the roof. Hodge performed an unreasonable investigation by failing to document all of the damage to the roof.  Hodge did not conduct a thorough roof inspection and only allowed the minimum cost to repair the roof. As a result of Hodge's unreasonable and brief investigation, the insured was wrongly denied the full cost to replace the roof.

12.    Hodge performed an insufficient and unreasonable interior investigation of the property.  Water intrusion from the roof caused extensive damage to the main hallway, front nursery, other hallways, sanctuary, nursery, and storage area.  The extensive damage to the interior of the property called for the drywalls to be sealed, hung, taped,

and floated, removal and replacement of insulation, repair to the texture, painting, and contents removal.  As a result of Hodge's unreasonable investigation, the insured was wrongly denied the full cost to repair all of the interior damage.

13.  Hodge performed insufficient and unreasonable interior and exterior investigations of the insured property.  As a result, Hodge missed significant interior and exterior damages to the insured property. Hodge conducted an insufficient inspection and prematurely closed insured's claim.  At the time of the investigation, premature closing of claims was part of a pattern and practice of claims handling by Philadelphia Indemnity.

14.  Philadelphia Indemnity failed to properly adjust the claim and defendant has denied at least a portion of the claim without an adequate investigation, even though the policy provided coverage for losses such as those suffered by insured.  Furthermore, Philadelphia Indemnity underpaid portions of the insured's claims by not providing full coverage for the damages sustained by the insured, as well as under-scoping the damages during its investigation.  Defendant had no reasonable basis to deny any portion of plaintiff's claim.

15.  To date, Philadelphia Indemnity continues to delay in the payment for the damages to the property.  As such, the insured's claim(s) still remain unpaid and the insured still has not been able to properly repair the property.

## F. THE APPRAISAL PROCEEDING

16.   Subsequent to the insured's filing of the claim, the parties submitted the claim to the appraisal process pursuant to the terms of the insurance policy.   The appraisers inspected the loss on or about April 10, 2020.  On April 21, 2020, the appraisers issued an appraisal award in the amount of $81,051.53.   The appraisers promptly notified each party of the appraisal decision.

17.   On April 23, 2020, the defendant insurance company notified the plaintiff that the insurance company would stand by its original coverage decision and would disregard the appraisal decision.  The defendant informed the plaintiff that the defendant was maintaining its position that some of the damage reflected in the appraisal decision was not covered by the policy.   The defendant refused to pay any portion of the appraisal award.

## G. THE CASUALTY INSURANCE SYSTEM

18.   The casualty insurance industry is one in which policyholders are forced to buy an unseen, but socially essential, financial product "on faith" from insurers who market their product with promises of prompt and full protection.[1]  The indemnity principle of insurance expresses the casualty insurer's traditional duty to provide full restitution of covered casualty losses in order to preserve its insureds' standard of living or operating

---

[1] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 42 (2nd ed. Trial Guides, LLC, 2008).

standards.[2]  Under the fiduciary principle, "an insurance company holds funds of its insureds (the payment of premiums) in trust, and through an 'insuring agreement' promises to make *all benefit payments for which it has received premiums.*"[3]

**THE ROLE OF INSURANCE UNDERWRITING**

19.    Underwriting is the process of (1) deciding which accounts are acceptable, (2) determining the premiums to be charged and the terms and conditions of the insurance contract, and (3) monitoring those decisions.[4]  Underwriting is what insurers do to be financially successful.[5]  Although insurers include other specialty departments such as actuarial, claims, and marketing, all insurer activities follow from corporate underwriting decisions.[6]  The purpose of underwriting is to ensure that the risk transfer is equitable and the insurer is able to develop and maintain a growing, profitable book of business.[7]

20.    The law of large numbers helps insurers predict the number of losses they will pay in any given time period so that they can determine what premium is required to pay those losses.[8]  The law of large numbers enables insurers to offer large dollar amounts of coverage for much less money in return.[9]  Insurers underwrite a large number of

---

[2] *See* Rubin, Harvey W., DICTIONARY OF INSURANCE TERMS, at 218, (3rd ed. Barron's 1995), hereinafter referred to as "Rubin."
[3] *Id* at 167.
[4] Joseph F. Mangan, CPCU and Connor M. Harrison, CPCU, AU, *Underwriting Principles* at p. 1 (2nd ed. The Institutes 2010), hereinafter referred to as "Mangan."
[5] *Id*.
[6] *Id*.
[7] *Id*. at 2. ("Book of Business" is insurance industry terminology that refers to the collection of all the policies written by an insurer.  Although the term can have various meanings, this text will use it to refer to all of an insurer's policies).
[8] James Markham, Kevin M. Quinley, and Layne S. Thompson, *The Claims Environment*, at 1.2 (Malvern, Pa.: IIA, 1993), hereinafter referred to as "Markham."
[9] *Id*.

similar risks and predict the dollar amount of all the losses that those insureds are expected to experience.[10]  Premiums are based on each insured's share of the predicted losses plus the insurer's expenses and an allowance for profit.[11]

21.  Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in the rates.[12]  If underwriters accept risks that experience more losses than anticipated, then the rates will be inadequate and the insurer's solvency might be threatened.[13]  Actuaries predict the number of losses that will occur and the amount of money that insurers will pay in claims to develop rates for insurance.[14]  The claim department provides the raw data, such as number of claims, claim payments, and reserve amounts, that actuaries analyze through complex mathematical methods.[15]  Actuaries use this actual claims data in predicting the number of losses that will occur and the amount of money that insurers will pay in claims.[16]  Insurers then use this information to set premium rates that will enable the insurers to pay the predicted amount of policyholder claims, pay the insurers' expenses, and make a reasonable profit/surplus.[17]  Insurance companies could not provide this valuable service unless they were able to make a legitimate profit sufficient to allow them

---

[10] *Id.*
[11] *Id.*
[12] *Id* at 1.13.
[13] *Id.*
[14] *Id.* at 1.15.
[15] *Id.*
[16] *See* Markham, at 1.15.
[17] *Id.* at 1.2.

to remain solvent and provide a reasonable return to their shareholders/stakeholders.[18] Premiums are already calculated to allow insurers to accomplish both of those goals.[19]

22.   Casualty insurance is designed to pay the full cost of the property casualty losses suffered in a covered event.[20]  Under the indemnity principle, the "objective [of casualty insurance] is to restore the insured to the same financial position after the loss that he or she was in prior to the loss."[21]  When casualty insurance works properly, it achieves this socially vital objective – and our lives can proceed relatively unimpaired by the financial hardship of an unexpected casualty loss.[22]  When casualty insurance fails and leaves us in a worse financial position after a covered loss, the indemnity principle is defeated, and we all suffer the consequences.[23]  In the claim at hand, the defendant insurer set its premium rates in a manner that failed to provide it with sufficient claim trust funds to pay the anticipated loss for plaintiff's claim and for the other insureds' claims in its book of business.  The defendant's failure to adequately set its premium rates caused defendant to deny full payment for plaintiff's claim.

---

[18] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 36 (2nd ed. Trial Guides, LLC, 2008), hereinafter referred to as "Berardinelli."
[19] *See* Markham, at 1.2.
[20] *See* Berardinelli, at 7.
[21] *See* Rubin, Harvey W., DICTIONARY OF INSURANCE TERMS, at 218 (3rd ed. Barron's 1995).
[22] *See* Berardinelli, at 7.
[23] *Id*.

## HOW INSURANCE PREMIUMS ARE CALCULATED

23.    The primary building block of casualty premiums is called "loss costs."[24]  Loss costs are the insurer's good faith projection on how much it will pay for legitimate claims during a given policy period.  Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers."[25]  Loss costs make up generally about seventy cents ($0.70) of every premium dollar we pay for property-casualty coverages.[26]

24.    Insurers charge their policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period.[27]  Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for the insurer's profit.[28]  In addition, the insurer's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten

---

[24] Also called "loss trends."  *See* Rubin, at 278, Footnote 1 on page 7, *supra; Id.*, at 278, 384.

[25] "In a statistical context, 'law of large numbers' implies that the average of a random sample from a large population is likely to be close to the mean of the whole population."  *See* Wikipedia Encyclopedia, http://en.wikipedia.org/wiki/Law_of_large_numbers.

[26] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.

[27] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.

[28] *See* Berardinelli, at 19.

cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.[29]

25.   The seventy cents ($0.70) of the policy dollar is the part of the premium fund designated to pay policyholder claims.[30]  If the insurer's promise to pay claims is the product we are buying, then the insurer's projection of loss costs is like that statement on the product label describing important details of the product to the customer.[31] Policyholders do not want to pay for more losses than the insurer is actually going to pay – just as consumers do not want to pay for more of a product than they are actually going to receive from their purchase.[32]

26.   Policyholders expect insurers to design their "claim payment factory" to generate a product that meets the expectations created by the promises the insurers make on the label of every product it sells, i.e., … the insurance policy.[33]  Policyholders' most important expectations are full indemnification and peace of mind – the security of knowing covered casualty losses will be restored promptly and fairly, without being forced through a lot of needless adversarial hoops.[34]  Policyholders do not expect the insurance product to be designed so that only experts, attorneys, and insurance professionals can figure out how to obtain its promised benefits.[35]  Rather, policyholders

---

[29] *Id.*
[30] *Id* at 20.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] See *Zilisch v. State Farm Mutual Insurance Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000).
[35] *See* Berardinelli, at 20-21.

expect to be able to receive the benefits of their insurance policies themselves without a lot of difficulty and delay and without professional help.[36]

## THE ROLE OF THE CLAIMS ADJUSTER

27.   Claims are handled well when insurance companies pay what they owe, promptly and without muss or fuss.[37]  When claims departments become transformed into profit centers and the job of claims adjuster is redesigned to be a contributor to corporate profits, however, how claims departments work affects how well they work.[38] With a new, systematic approach to the claims process, claims departments work well for the insurance companies but sometimes not so well for those who rely on them.[39]

28.   As late as the 1970's, most insurance adjusters exercised a great deal of discretion.[40]  The adjuster saw his job as settling claims for a fair amount.[41]  The common understanding was "we close the case out with everybody happy" by paying "what the claim is worth."[42]  Insurance companies were not in business to "chisel" the public.[43]  If the insurance company knew the claim was worth $20,000, then the insurance company paid $20,000.[44]

---

[36] *Id*. at 21.
[37] Feinman, Jay M., *Delay, Deny, Defend: Why Insurance Companies Don't Pay Claims and What You Can Do About It*, at 86 (1st ed. Penguin Group 2010), hereinafter referred to as "Feinman."
[38] *Id*.
[39] *Id*.
[40] *Id*. at 87.
[41] *Id*.
[42] H. Laurence Ross, *Settled Out of Court: The Social Process of Insurance Claims Adjustments* (Chicago: Aldine, 1970), 46-54.
[43] *See* Feinman, at 87.
[44] *Id*.

29.   The claims adjuster whose job demands brains, integrity, and guts is now much less in evidence, because most adjusters are more closely bound to office and computer and are subject to elaborate systems that direct their work.[45]  Today's adjuster is less an advocate for fair treatment of the consumer, because adjusters are often required to conform to the demands of the claim-processing system and are evaluated on their conformity to the system, including, explicitly or implicitly, on the amount paid out, or not paid out, in claims.[46]  The key to the claim process is the system, not the adjuster.[47]  A highly organized, industrialized system for processing claims is the key to modern insurance adjusting.[48]  The model is the shift from individual craftsman as jack-of-all-trades to specialized production in which each worker in a factory produces a single product, over and over.[49]  Because the adjuster has less discretion, he needs less training, and the training that is provided is focused on applying the system.[50]  More than a third of insurance companies provide new adjusters with two to four weeks of training, and one out of eight companies provide less than a week of training or no training at all.[51] The knowledge that is needed for processing claims is built into the system and therefore does not have to be held by the adjuster.[52]  Adjusters have become less independent and

---

[45] *See* Feinman, at 87.
[46] *Id*.
[47] *Id*. at 88.
[48] *Id*.
[49] *Id*. at 89.
[50] *Id*.
[51] R. Jones, Ira Blatt, and Thomas G. Barger, "Keeping Customers and Employees Happy: Claims Best Practices," *Claims* (October 2001), 50.
[52] *See* Feinman, at 90.

more efficient from the company's point of view, with efficiency defined in terms of following the dictates of the claims systems.[53]  The systems dictate process and results, and adjusters are evaluated on their adherence to the system.[54]  The adjuster's new role, therefore, is less to be an experienced professional making an individual evaluation of each claim and more a clerk executing the demands of the system.[55]  From the company's and the adjuster's perspective, this makes each claim much like every other claim, which generates efficient and predictable results.[56]  From the policyholder's perspective, of course, that is not the point of the insurance policy; the point of the insurance policy is prompt and fair processing of a unique loss.[57]  In the case at hand, the defendant evaluated plaintiff's claim in an outcome oriented fashion according to the defendant's predetermined goals for its claims handling system, and failed to evaluate plaintiff's claim according to the unique characteristics of the claim.  This type of claim evaluation caused defendant to wrongly deny all or part of plaintiff's claim.

30.    The most widely information system in property casualty insurance adjusting is Xactimate®, which estimates the cost of repairs to damaged homes and other property.[58] Xactimate® is software for estimating the extent of a loss and the cost of repairs that

---

[53] James Mathis, "Efficient or Malicious," United Policyholders Website, May 2008, www.unitedpolicyholders.org/e_news/May08/article_Auto.html.
[54] *See* Feinman, at 91.
[55] *Id*.
[56] *Id*.
[57] *Id*.
[58] *Id*. at 92.

presumes to be exact.[59]  A property loss adjuster takes his Xactimate®-loaded laptop and measures, records and lists information about the damaged property, and the program produces a dollar amount that will be the basis of the insurance company's payment of a claim.[60]  Xactimate® works off choices made by the adjuster, and because it needs to cover many different situations, the program is designed to give the adjuster a wide range of choices.[61]  Each of these choices affects the repair estimate.  When drywall is replaced, the new drywall needs to be painted; the adjuster must choose the appropriate application – seal/prime, seal then paint, paint one coat, or paint two coats – each of which will produce a different cost estimate.[62]  If a large area of drywall needs to be replaced, the adjuster may or may not decide the furniture and other contents need to be removed to allow for work space and to protect the contents; that can be accounted for as labor and contents manipulation, with the adjuster adding a variable for the time needed or the size of the room as small, medium, or large.[63]  In the case at hand, the defendant manipulated Xactimate® in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

31.   If Xactimate® was actually exact, it would benefit insurance companies and policyholders alike.[64]  Unfortunately, Xactimate® permits considerable error by adjusters

---

[59] *Id*. at 93.
[60] *Id*.
[61] *Id*. at 168.
[62] *Id*.
[63] *Id*.
[64] *Id* at 93.

and is subject to manipulation by insurance companies.[65]  Xactimate® is a tool and, like any other tool, it is neither perfect nor impervious to misuse.[66]  It first depends on an accurate scope of the work and, as with any program, the concept of "garbage in, garbage out" applies.[67]  Any errors in scope will produce an inaccurate estimate.[68]  Like other elements of the systematic approach to claims processing, Xactimate® might favor efficiency and profits at the expense of accuracy and fairness.[69]  In the case at hand, the defendant's adjusters committed considerable error in their use of Xactimate® and manipulated Xactimate® in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

32.    The adjuster's job is to honor the company's promise to pay what is owed, no more but no less.[70]  Whether and how much an adjuster pays in a particular case or all cases should depend only on how much the company owes on claims.[71]  If the adjuster's pay, or the adjuster's status as a third-party vendor, is tied to reducing claim payouts or on closing cases without payment, then the insurance company has given the adjuster an incentive to violate accepted practices and break the promise the company made to its policyholders.[72]  In the case at hand, the defendant provided positive and/or negative

---

[65] *Id.*
[66] *Id.* at 167.
[67] *Id.* at 144.
[68] *Id.* at 167.
[69] *Id.* at 93.
[70] *Id.* at 94.
[71] *Id.*
[72] *Id.* at 95.

incentives to its adjusters that caused defendant's adjusters to adjust the claim in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

33.    When a policyholder files a claim, the fundamental truth about the claim process should come into play: when a loss occurs that is within the coverage of the insurance policy, the policyholder has already paid for the loss.[73] The risk has been defined, priced, transferred from the insured to the insurance company, and shared by the company among its policyholders and investors, so all that is legitimately left to be done is to pay the claim.[74] From the policyholder's point of view, the covered event should now be risk free – that is, free of the risk that the company will fail to pay what it owes.[75] The actuary's job is to evaluate risk characteristics, the underwriter's job is to evaluate potential insureds, and the executive's job is to manage the whole process, but the claims adjuster's only job is to decide if a loss falls within the policy, determine the extent of the loss, and pay the claim.[76] In the case at hand, the policyholders of which Philadelphia Indemnity's book of business was comprised paid the full value of plaintiff's loss.   However, Philadelphia Indemnity intentionally and strategically failed to transfer those claim trust funds to plaintiff and instead retained those funds as profit.  Philadelphia Indemnity's wrongful actions led to the improper denial of plaintiff's claim.

---

[73] *Id*. at 25.
[74] *Id*.
[75] *Id*.
[76] *Id*.

INSURANCE COMPANIES' USE OF LITIGATION

34.   "When an insured buys insurance, she buys insurance – not a lot of vexatious, time-consuming, expensive litigation with her insurer."[77]  As stated previously, insurance companies account for future claim payouts, claim expenses, and a reasonable profit in setting premium rates for their books of business.[78]  However, insurance companies have hired consulting companies, such as McKinsey & Company, to implement plans, strategies, policies, and processes to transform insurance companies' claim departments into profit centers.[79]  McKinsey & Company is the most powerful consulting company in the world and has "the greatest global reach of any advisor to management in the world."[80]  It serves as the chief advisor and key architect of strategic thinking for "147 of the world's 200 largest corporations, including 80 of the top 120 financial-services firms, 9 of the 11 largest chemical companies, and 15 of the 22 biggest health-care and pharmaceutical concerns."[81]  McKinsey's clients pay from $10 million to $60 million per year for advice on how to manage their business operations to increase profitability.[82]  McKinsey & Company acted as a leader in formulating a new insurance strategy to convert insurance claim departments into efficient profit centers.  Many of the world's

---

[77] *Hayseeds, Inc. v. State Farm Fire & Casualty*, 352 S.E.2d 73, 79 (W. Va. 1986).
[78] *See* Mangan, at 2.
[79] *See* Feinman, at 12.
[80] *See* Byrne, John, *Inside McKinsey*, BUSINESSWEEK-ONLINE, July 8, 2002, http://www.businessweek.com/magazine/content/02_27/b3790001.htm (accessed February 2006), hereinafter cited as "Byrne."
[81] *Id*. at Footnote 5 on page 10, *supra*.
[82] *Id*.

largest insurers hired McKinsey for this purpose.[83]  However, although every insurance company did not hire McKinsey directly and did not have a direct relationship with McKinsey, McKinsey's policies influenced the operations of the insurance industry as a whole because of the extraordinary results McKinsey achieved for the insurance companies that did retain McKinsey directly for its consulting services.  By 1992, McKinsey had already worked on a number of projects for insurance companies seeking to increase profits.  These included State Farm, Hartford, United Services Automobile Association (USAA), and possibly Nationwide, and Liberty Mutual as well.[84]  During the mid-1980's, USAA invited interested members of the insurance community to its home office in San Antonio for open discussions about McKinsey's redesign of its claim system.[85]  USAA credited McKinsey with "saving" the company and openly shared information about McKinsey's creation of USAA's new claims handling system.[86]

35.    In essence, the McKinsey strategy calls for insurance companies to take measures to reach various goals as part of its design to convert the insurance claims handling department into an efficient profit center.  A major goal of this strategy is to shift any advantage away from the insureds and plaintiff attorneys.[87]  As the first step in the

---

[83] *See* "The McKinsey Slides," at 12373-12386.
[84] *Id.*
[85] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 36 (2nd ed. Trial Guides, LLC, 2008).
[86] *See* Affidavit of Gary T. Fye, ¶ 20, *King v. Philadelphia Indemnity Ins. Co.*, SF 97-3008(c), filed July 28, 1999. Gary T. Fye is a nationally known claim handling expert who has testified in a number of cases nationwide regarding Allstate's CCPR program.  Mr. Fye testified in *Campbell v. State Farm Mut. Auto. Ins. Co.*, 65 P.3d 1134, 1148 (Utah 2001).  *See also* Rasiel, Ethan M., THE MCKINSEY WAY, at xi (McGraw-Hill 1999).  Mr. Raisel's book is based on his personal experiences as a McKinsey associate between 1989 and 1992.  *Id.*, at xiv.
[87] *See* "The McKinsey Slides," at 2929.

process, insurers reduce attorney representation levels by improving the initial customer service experience for its insureds.  Specifically, insurers make early contact with the insureds following a claim, promises fair treatment, and promises prompt payment.[88]  During the claim investigation, insurers aggressively investigate only the facts which defeat the claim once attorney representation begins.[89]  Insurers then make "firm" [take-it-or-leave-it] settlement offers with no real negotiation.[90]  If the insured refuses to accept the "firm" offer, then the insurance company aggressively litigates the claim to verdict without negotiation or compromise, employing hard-nosed tactics designed to make litigation so lengthy and expensive that policyholders and attorneys will yield to the insurer's claim values.[91]  Essentially, policyholders who want "prompt" payment – meaning they are willing to give the insurance company a cut from their share of the claim trust fund – get "Good Hands" treatment; while policyholders who want "fair" payment – meaning they refuse to give the insurance company a cut from their share of the claim trust fund – get "Boxing Gloves" treatment.[92]  No policyholder, however, would get both prompt *and* fair payment of a claim.[93]

36.    McKinsey implemented a litigation management system designed to enforce policyholder acceptance of its new claim system.  Under traditional casualty insurance

---

[88] *See* Berardinelli, at 90.
[89] *Id*.
[90] *Id*.
[91] *Id*.
[92] *Id*. at 95.
[93] *Id*.

thinking, insurers were naturally disposed to avoiding litigation whenever possible, because litigation tended to defeat the goals of the fiduciary/indemnity paradigm.[94] McKinsey saw litigation as providing the best possible venue for achieving the goals of its new system for casualty insurance.[95]   Litigation is costly and time consuming. It allows an insurer to fully exploit its overwhelming financial superiority and the policyholder's vulnerability to delay, which is the natural consequence of the casualty loss.[96]   Litigation would also provide a means for McKinsey to send messages to other policyholders and plaintiff's attorneys about the futility of resistance to the new system.[97]

37.   In addition to these company-level procedures, McKinsey implemented an insurance company strategy that focused on societal, legislative, and commercial measures which all but ensured the success of the strategy.   McKinsey implemented a plan for insurance companies to lead national campaigns to attempt to change public policy, abolish or reduce the effectiveness of bad faith statutes, and judicially repeal the common law fiduciary/indemnity paradigm which made it bad faith for casualty insurers to use increased shareholder value or increased claim surpluses as the only legitimate goals of claim handling.[98]

---

[94] *Id*. at 124.
[95] *Id*.
[96] *Id*.
[97] *Id*.
[98] *See* "The McKinsey Slides," at 2929.

38.   Although defendant may not have hired McKinsey & Company directly to design defendant's claim handling system, defendant's claim handling factory incorporates the strategies and principles that McKinsey introduced to the insurance industry and defendant's claim factory operates in a manner that is identical to the system created by McKinsey.  Defendant's claim handling protocols, company goals, profit goals and claim handling strategy originate from the doctrine that was created, implemented, and shared with the insurance community by McKinsey.   Defendant's protocols, strategies, and procedures for handling first-party property insurance claims are closely aligned with and virtually matches the claims handling system created by McKinsey.  In the case at hand, defendant implemented a McKinsey based claim handling system to increase its profits at plaintiff's expense.

## H. Information Likely to be in the Possession of Philadelphia Indemnity

39.   As with all bad faith cases, most of the proof of plaintiff's bad faith claim against Philadelphia Indemnity will be uniquely and solely in Philadelphia Indemnity's possession.  One of the ways in which Philadelphia Indemnity achieved lowered claim payments was to adopt an aggressive strategy towards claims resulting from weather events.  Following these damage producing weather events, Philadelphia Indemnity implements a policy of standard denial, which requires insurance adjusters to initially deny policyholder claims as a means of gauging the policyholder's willingness to haggle with the insurance company.  If the policyholder accepts the denial, then Philadelphia

Indemnity retains all of the money owed to the policyholder.  In essence, Philadelphia Indemnity eliminates claims by issuing sweeping denials under the presumption that some policyholders will accept the denial without question.  Policyholders who refuse to accept the denial and choose to pursue their claim through litigation, however, face "mad dog defense tactics" that frustrate policyholders' ability to pursue their claims.  In addition, because litigating insurance bad faith claims has become so expensive and time consuming, policyholders and attorneys are becoming increasingly unwilling to fight insurance companies.  Thus, Philadelphia Indemnity not only frustrates policyholders' attempts to pursue their claim, but Philadelphia Indemnity also sends a message to plaintiff's attorneys that filing suit against Philadelphia Indemnity does not constitute an economically viable option.

40.  Philadelphia Indemnity also creates an environment that encourages independent adjusters to underpay claims.  By tracking the average amount paid on claims for each adjuster, Philadelphia Indemnity is able to determine which adjusters are keeping costs down.  Philadelphia Indemnity therefore rewards independent adjusters by giving them additional business in exchange for minimizing Philadelphia Indemnity's indemnity payout on claims.  This arrangement creates a conflict of interest between the independent adjusters and the policyholders and allows the policyholders to detrimentally rely on the independent adjusters' determinations without knowledge of the conflict of interest.  In this case, Philadelphia Indemnity assigned an inadequately

trained adjuster to inspect plaintiff's property and adjust plaintiff's claim.  In addition, the adjuster had a Philadelphia Indemnity-provided financial incentive to deny all or part of plaintiff's claim.

41.    In the case at hand, Philadelphia Indemnity denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns.  To date, Philadelphia Indemnity continues to delay in the payment for the damages to the property.  As such, the plaintiff's claim still remains unpaid and the plaintiff was never able to properly repair the property.

## I. COUNT 1 - BAD FAITH

42.    Plaintiff is an insured under an insurance contract issued by Philadelphia Indemnity, which gave rise to a duty of good faith and fair dealing.

43.    Defendant breached the duty by denying and delaying payment of a covered claim when defendant knew or should have known its liability under the policy was reasonably clear.

44.    Following its initial inspection conducted on March 27, 2018, Philadelphia Indemnity possessed all information necessary to enable it to make a fair coverage and payment determination on plaintiff's claim.   In addition, following its initial inspection, Philadelphia Indemnity failed to provide coverage for all of the covered damage, including the damage that plaintiff's inspector discovered during his inspection.

Philadelphia Indemnity failed to honor its obligation to perform a reasonable investigation and issue timely payment to plaintiff.

45.    Defendant's breach of duty proximately caused injury to plaintiff, which resulted in the following damages:

    a.    mental anguish damages; and

    b.    loss of policy benefits.

46.    <u>Exemplary damages.</u>  Plaintiff suffered injury independent of the loss of policy benefits, and that injury resulted from defendant's gross negligence, malice, or actual fraud, which entitles plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

## J. COUNT 2 - BREACH OF CONTRACT

47.    In addition to other counts, Philadelphia Indemnity breached its contract with plaintiff.

48.    Plaintiff and defendant executed a valid and enforceable insurance contract.  The contract stated that defendant would pay the replacement cost of all damage which occurred to plaintiff's property caused by a covered peril, and that plaintiff would pay insurance premiums and perform other obligations as outlined in the insurance policy.

49.    Plaintiff fully performed plaintiff's contractual obligations.

50.    Philadelphia Indemnity breached the contract by refusing to pay the full amount of the cost to repair or replace the property.  Philadelphia Indemnity failed and refused

to pay any of the proceeds of the policy, although due demand was made for proceeds to be paid in an amount sufficient to cover the damaged property and all conditions precedent to recovery upon the policy had been carried out and accomplished by plaintiff.

51.    Plaintiff seeks unliquidated damages within the jurisdictional limits of this court.

52.    Attorney Fees.  Plaintiff is entitled to recover reasonable attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this suit is for breach of a written contract.    Plaintiff retained counsel, who presented plaintiff's claim to Philadelphia Indemnity.  Philadelphia Indemnity did not tender the amount owed within 30 days of when the claim was presented.

## K. COUNT 3 – DECEPTIVE INSURANCE PRACTICES

53.    Defendant Philadelphia Indemnity failed to explain to plaintiff the reasons for Philadelphia Indemnity's offer of an inadequate settlement.  Philadelphia Indemnity failed to offer plaintiff adequate compensation without adequate explanation of the basis in the policy for its decision to make less than full payment.  Furthermore, Philadelphia Indemnity did not communicate that any future settlements or payments would be forthcoming to pay for the entire losses covered under the policy, nor did they provide any explanation for the failure to adequately settle plaintiff's claim.

54.    Philadelphia Indemnity failed to affirm or deny coverage of plaintiff's claim within a reasonable time.  Specifically, plaintiff did not receive timely indication of

acceptance or rejection, regarding the full and entire claim, in writing from Philadelphia Indemnity.

55.   Philadelphia Indemnity refused to fully compensate plaintiff under the terms of the policy, even though Philadelphia Indemnity failed to conduct a reasonable investigation.  Philadelphia Indemnity performed an outcome-oriented investigation of the plaintiff's claim which resulted in a biased, unfair and inadequate evaluation of plaintiff's losses on the property.

56.   Philadelphia Indemnity failed to meet its obligations under the Texas Insurance Code regarding its duties to timely acknowledge plaintiff's claim, begin an investigation of plaintiff's claim, and request all information reasonably necessary to investigate plaintiff's claim within the statutorily mandated time of receiving notice of plaintiff's claim.

57.   Philadelphia Indemnity failed to accept or deny plaintiff's full and entire claim within the statutorily mandated time of receiving all necessary information.  In addition, Philadelphia Indemnity failed to communicate with plaintiff to ensure that plaintiff understood the coverage denials plaintiff received.

58.   Defendant's acts or practices violated:

a.   Texas Insurance Code chapter 541, subchapter B.

(1)   Misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue.  TEX. INS. CODE §541.060(a)(1).

(2)　　　Not attempting in good faith to bring about a prompt, fair, and equitable settlement of a claim once the insurer's liability becomes reasonably clear. TEX. INS. CODE §541.060(a)(2)(A).

(3)　　　Not promptly giving a policyholder a reasonable explanation, based on the policy as it relates to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim. TEX. INS. CODE §541.060(a)(3).

(4)　　　Not affirming or denying coverage within a reasonable time. TEX. INS. CODE §541.060(a)(4)(A).

(5)　　　Refusing to pay a claim without conducting a reasonable investigation. TEX. INS. CODE §541.060(a)(7).

(6)　　　Making an untrue statement of material fact. TEX. INS. CODE §541.061(1).

(7)　　　Leaving out a material fact, so that other statements are rendered misleading. TEX. INS. CODE §541.061(2).

b.　　Texas Deceptive Trade Practices Act §17.46(b).

(1)　　Representing that an agreement confers or involves rights, remedies, or obligations that it does not, or that are prohibited by law. TEX. BUS. & COM. CODE §17.46(b)(12).

c.　　Texas Insurance Code Chapter 541.151.

59.   Defendant's acts and practices were a producing cause of injury to plaintiff which resulted in the following damages:

    a.   actual damages; and

    b.   insurance policy proceeds.

60.   Plaintiff seeks damages within the jurisdictional limits of this Court.

61.   Additional damages.   Defendant acted knowingly, which entitles plaintiff to recover treble damages under Texas Insurance Code section 541.152(b).

62.   Attorney fees.   Plaintiff is entitled to recover reasonable and necessary attorney fees under Texas Insurance Code section 541.152(a)(1).

### L. COUNT 4 - LATE PAYMENT OF CLAIMS

63.   Plaintiff is an insured under a contract for homeowner's insurance issued by defendant.

64.   Defendant Philadelphia Indemnity is an insurance carrier doing business in the State of Texas.

65.   Plaintiff suffered a loss covered by the policy and gave proper notice to Philadelphia Indemnity of plaintiff's claim.

66.   Philadelphia Indemnity is liable for the claim and had a duty to pay the claim in a timely manner.

67.   Defendant breached its duty to pay plaintiff's claim in a timely manner by not timely:

    a.    acknowledging the claim;

    b.    investigating the claim;

    c.    requesting information about the claim;

    d.    paying the claim after wrongfully rejecting it; and

    e.    paying the claim after accepting it.

68.    Philadelphia Indemnity's breach of duty caused injury to plaintiff, which resulted in the following damages:

    a.    mental anguish damages;

    b.    policy proceeds;

    c.    prejudgment interest

69.    <u>Statutory damages.</u>  Plaintiff is entitled to recover actual damages in the amount of the claim, and under Texas Insurance Code section 542.060(a), statutory damages of 18% of the amount of the claim.

70.    <u>Attorney fees.</u>  Plaintiff is entitled to recover reasonable attorney fees under Texas Insurance Code section 542.060(b).

### M. COUNT 5 – COMMON LAW FRAUD

71.    Philadelphia Indemnity could not provide its insurance services unless it was able to make a legitimate profit sufficient to allow it to remain solvent and provide a reasonable return to its shareholders.[99]  The premium that Philadelphia Indemnity

---

[99] *See* Berardinelli, at 36.

required plaintiff to pay for the insurance policy was calculated to allow Philadelphia Indemnity to accomplish those goals.

72.    Philadelphia Indemnity charges its policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period.[100] Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for Philadelphia Indemnity's profit.[101]   In addition, Philadelphia Indemnity's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.[102]

73.    Philadelphia Indemnity made the material representation to plaintiff that Philadelphia Indemnity would pay the full cost of casualty losses, less the policy deductible, that plaintiff suffered in a covered event.   This representation was false. When Philadelphia Indemnity made this representation, Philadelphia Indemnity either knew the representation was false, or Philadelphia Indemnity made the representation recklessly, as a positive assertion, and without knowledge of its truth.   Philadelphia

---

[100] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.
[101] *See* Berardinelli, at 19.
[102] *Id.*

Indemnity made this representation with the intent that the plaintiff act on it. Philadelphia Indemnity knew that the plaintiff was seeking peace of mind, and Philadelphia Indemnity made the representation knowing that plaintiff would act on it. The plaintiff purchased the policy and paid all premiums in reliance on the representation and with the expectation that Philadelphia Indemnity would keep its promise.  The representation caused injury to plaintiff.

74.  Philadelphia Indemnity's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

      a.  actual damages;

      b.  exemplary damages; and

      c.  prejudgment interest

### N. COUNT 6 – FRAUD BY NONDISCLOSURE

75.  Philadelphia Indemnity's claim handling system would govern any claim filed by plaintiff under the policy.  As previously described, the purpose of Philadelphia Indemnity's claim handling program was to increase corporate profits at plaintiff's expense should plaintiff ever file a claim under the policy.  Philadelphia Indemnity concealed this fact from plaintiff and failed to disclose the facts about its claim handling system to plaintiff.  Because the operation of defendant's claim handling system directly contradicted the promises that Philadelphia Indemnity made to the plaintiff, Philadelphia Indemnity had a duty to disclose these material facts to plaintiff.  The

defendant knew the plaintiff was ignorant of the facts and that the plaintiff did not have an equal opportunity to discover the facts.  Philadelphia Indemnity was deliberately silent when it had a duty to speak.  By failing to disclose the facts, the defendant intended to induce the plaintiff to purchase the insurance policy.  Plaintiff purchased the policy and thus relied on Philadelphia Indemnity's nondisclosure.  Plaintiff was injured as a result of acting without the knowledge of the undisclosed facts.

76.    Philadelphia Indemnity's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

     a.    actual damages;

     b.    exemplary damages; and

     c.    prejudgment interest

## O. COUNT 7 - BREACH OF FIDUCIARY DUTY

77.    The defendant collected claim trust funds from plaintiff and the other insureds that encompassed Philadelphia Indemnity's book of business.  Defendant owed a fiduciary duty to plaintiff and its other insureds to use those funds to pay policyholder claims, or to set those funds aside in escrow for the purpose of paying policyholder claims.  Therefore, the plaintiff and defendant had a fiduciary relationship that arose prior to the date of loss and the date of claim.

78.    By creating and employing a claims handling scheme designed to reduce claim payouts from the claim trust fund and instead allocate those funds to corporate profits,

defendant breached its fiduciary duty to plaintiff.  In the case at hand, the defendant denied plaintiff's claim as part of its overall scheme to reduce claim payouts and increase shareholder profits.  The reasons defendant gave for denying plaintiff's claim were pretext, and defendant actually denied plaintiff's claim as a means to divert the portion of the claim trust fund allocated to pay plaintiff's claim to profit.  The defendant's breach proximately caused injury to the plaintiff and/or resulted in a benefit to the defendant.

79.  Philadelphia Indemnity's breach of duty caused injury to plaintiff, which resulted in the following damages:

     a.   actual damages;

     b.   exemplary damages; and

     c.   prejudgment interest.

80.  <u>Constructive Trust.</u>  Plaintiff asks the court to place a constructive trust on proceeds, funds, or property obtained as a result of defendant's breach of fiduciary duty.

81.  <u>Fee Forfeiture.</u>  Plaintiff asks the court to order that all or part of the fees collected by defendant be forfeited as a result of defendant's breach of fiduciary duty.

82.  <u>Contractual Consideration Forfeiture.</u>  Plaintiff asks the court to order that all or part of the contractual consideration received by defendant be forfeited as a result of defendant's breach of fiduciary duty.

**P. JURY DEMAND**

83.  Plaintiff respectfully requests a trial by jury.

## Q. CONDITIONS PRECEDENT

84.   All conditions precedent to plaintiff's claim for relief have been performed or have occurred.

## R. PRAYER

85.   For these reasons, plaintiff asks that plaintiff be awarded a judgment against defendant for the following:

     a.   Actual damages.

     b.   Prejudgment and postjudgment interest.

     c.   Court costs.

     d.   Attorneys' fees.

     e.   Exemplary damages.

     f.   All other relief to which plaintiff is entitled.

Respectfully submitted,

SCOTT LAW OFFICES, P.C.
The Jones Building
708 Main Street
Houston, Texas 77002
Telephone: (713) 941-9309
Facsimile: (844) 270-0740


  */s/Danny Ray Scott*
_____
Danny Ray Scott
State Bar No. 24010920
casenotifications@scottlawyers.com

*Attorney for Plaintiff*